# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-1619
_____

United States of America,

*Plaintiff - Appellee,*

v.

Karla Myles,

*Defendant - Appellant.*
_____

Appeal from United States District Court
for the Northern District of Iowa - Waterloo
_____

Submitted: January 16, 2020
Filed: June 12, 2020
_____

Before COLLOTON, SHEPHERD, and ERICKSON, Circuit Judges.
_____

COLLOTON, Circuit Judge.

Karla Myles entered a conditional guilty plea to one count of making a false material declaration before a grand jury. *See* 18 U.S.C. § 1623. The district court[1]

_____

[1]The Honorable John A. Jarvey, Chief Judge, United States District Court for the Southern District of Iowa, sitting by designation.

sentenced her to 24 months in prison. On appeal, Myles argues that the district court erred in a pretrial ruling that excluded evidence of a defense of duress. She also disputes the court's calculation of the advisory guideline range at sentencing. We conclude that there was no reversible error and affirm the judgment.

I.

The prosecution arose from an incident in November 2016 when Myles visited her daughter and grandchildren at a house in Waterloo, Iowa. Myles's daughter shared the residence with Eric Sallis. During the visit, Myles engaged in an argument with Sallis. Sallis then pulled out a handgun, pointed it at Myles, and told her to leave. Myles attempted to call the police, but Sallis slapped her cellular phone out of her hand.

As Myles left the residence, she passed a group of men who were entering the house. She told them that Sallis was upstairs with a gun. Myles walked toward her car and heard several gunshots fired inside the house. One of the men, with initials "T.C.," fled the residence and asked Myles to drive him to the hospital because Sallis had shot him. Myles told the police at the hospital that she saw Sallis with a gun and identified him as the shooter.

During an investigation of the incident and Sallis's possession of a firearm, a federal grand jury issued a subpoena commanding Myles to testify. Myles met with a federal prosecutor and a local police officer before she appeared in front of the grand jury. She explained that she had spoken with her pastor and realized that she needed to tell "the truth," which she then said was that she had no information about the shooting. Myles testified before the grand jury that she never entered her daughter's residence on the day of the shooting, did not know who was in the house, was not threatened with a gun that day by Sallis, and never heard from T.C. that Sallis had shot him. The government eventually prosecuted Sallis for unlawful possession

of a firearm and ammunition as a convicted felon. *See United States v. Sallis*, 920 F.3d 577 (8th Cir. 2019).

In May 2018, the grand jury charged Myles with making a false material declaration before a grand jury. Myles filed a notice stating that she would rely on a defense of duress, and the government moved to exclude any evidence on the subject. The government argued that any evidence supporting such a defense was insufficient as a matter of law.

At an evidentiary hearing, Myles admitted that she lied to the grand jury. She asserted, however, that when she testified before the grand jury, she feared for her safety based on threats that she learned about in the preceding months. Myles testified at the hearing that her sister and niece told her that they overheard people discussing that Myles or her family might be harmed if she testified against Sallis. She admitted that no specific person threatened her, and that she did not receive any threats directly. Myles said she believed that Sallis could arrange for someone else to harm her on his behalf. When asked why she did not report the threats to the police, Myles explained that she "didn't have any proof" that she had been threatened.

Myles's sister also testified about an incident at a nail salon in January 2017. The sister said that she overheard several women discussing the shooting and saying that "somebody was gonna do something to [Myles] if she snitched." The sister confirmed that her daughter heard similar rumors. Myles's sister did not report these threats to the police because "it was just rumors" and "nail shop talk."

Myles also presented evidence that she changed her behavior around the time of the rumored threats. She moved in with her sister and withdrew from social activities. Myles showed through exhibits that Sallis had a violent criminal history, and that her name and information that she provided to police appeared in an application for a warrant to search Sallis's residence.

-3-

The district court concluded that Myles presented insufficient evidence to advance a defense of duress and granted the government's motion to exclude the evidence at trial. Myles then entered a conditional guilty plea, reserving her right to appeal the court's ruling on the motion. The district court calculated an advisory guideline range of 30 to 37 months in prison and varied downward to a term of 24 months, followed by two years of supervised release.

## II.

Myles argues on appeal that the court erred in refusing to allow evidence in support of a duress defense. To establish duress or coercion, a defendant must show that (1) she was under an unlawful and present, imminent, and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury, (2) that she had not recklessly or negligently placed herself in a situation in which it was probable that she would be forced to commit a criminal act, (3) that she had no reasonable, legal alternative to violating the law, and (4) that a direct causal relationship may be reasonably anticipated between the commission of the criminal act and the avoidance of the threatened harm. *United States v. Jankowski*, 194 F.3d 878, 883 (8th Cir. 1999).

Citing *United States v. Harper*, 466 F.3d 634, 648 (8th Cir. 2006), Myles argues that she need only present "prima facie" evidence on each element of duress, at which point the government must bear the burden to prove beyond a reasonable doubt that she did not act under duress. *Harper* relied on *United States v. Simpson*, 979 F.2d 1282, 1287 (8th Cir. 1992), to apply that framework in considering a proffered defense of coercion. The Supreme Court in *Dixon v. United States*, 548 U.S. 1 (2006), however, rejected *Simpson* and explained that the common law long required a defendant to bear the burden of proving the existence of duress by a preponderance of the evidence. *Id*. at 4 n.1, 15-16. Where, as in the perjury statute, Congress is silent about the defense, we presume that Congress intended to retain the

common-law rule. *See id*. at 17; *United States v. Sanchez-Gonzalez*, 643 F.3d 626, 628 n.2 (8th Cir. 2011). Therefore, a district court properly excludes evidence of the defense if the evidence taken in the light most favorable to the defendant would not support a finding of duress by a preponderance of the evidence. *See United States v. Bailey*, 444 U.S. 394, 415 (1980).

On the first element of a duress defense, Myles failed to present sufficient evidence to support a finding that she faced a present, imminent, and impending threat. Duress requires more than a "generalized and speculative fear" of violence. *United States v. Morales*, 684 F.3d 749, 756 (8th Cir. 2012). There must be a specific threat of immediate harm. *See United States v. Sixty Acres in Etowah County*, 930 F.2d 857, 860-61 (11th Cir. 1991); *United States v. Villegas*, 899 F.2d 1324, 1344 (2d Cir. 1990). Myles heard alleged threats only through her sister and niece, and the feared harms and potential perpetrators were largely speculative. Myles testified that she was told that unknown persons had said "something was gonna happen to [her] and [her] family" if she testified. But even her sister characterized the threats as "just rumors," and both Myles and her sister testified that they did not contact the police because the threats were vague. A generalized fear that a subject of grand jury testimony might retaliate against a witness is insufficient to establish an imminent threat of harm that would support a defense of duress.

Myles also did not present sufficient evidence to support a finding that she "had no reasonable, legal alternative" to giving false testimony: she could have reported the alleged threats to law enforcement officers. *Jankowski*, 194 F.3d at 883; *Harper*, 466 F.3d at 648. Myles had at least three conversations with law enforcement personnel after hearing the alleged threats, including a meeting with a prosecutor and investigator on the day of her testimony, but she never reported any fear of reprisal to authorities until after she testified falsely and learned that she was under investigation for perjury. Myles argues that she did not alert the police because she lacked proof of the threats, and that reporting a threat could have increased the

likelihood of retaliation. But "a defendant's subjective belief that going to law enforcement would prove futile is insufficient," *Harper*, 466 F.3d at 648, and the same goes for her theory that it would be counterproductive. The record here does not approach establishing a breakdown in law enforcement that might justify declining to make a report. *Cf. Jankowski*, 194 F.3d at 883 n.3.

We do not gainsay that Myles may subjectively have feared that Sallis or his unidentified associates could have retaliated against a witness who implicated him before the grand jury. But "the public has a right to every man's evidence," *United States v. Nixon*, 418 U.S. 683, 709 (1974) (internal quotation and alterations omitted), and the grand jury cannot function effectively if witnesses have discretion to withhold material information. The grand jury's authority to subpoena witnesses is "essential to its task." *Branzburg v. Hayes*, 408 U.S. 665, 688 (1972). The rule of law requires that even witnesses who subjectively fear reprisal must appear and provide truthful testimony unless they face a specific threat of imminent harm and have no reasonable alternative to testifying falsely. Because Myles failed to present sufficient evidence on elements of the defense, the district court correctly excluded evidence of duress from use at trial.

## III.

Myles contends that the district court committed procedural error at sentencing by miscalculating her base offense level and the resulting advisory guideline range. We review the district court's guideline calculations *de novo* and its factual determinations for clear error. *United States v. Small*, 599 F.3d 814, 815 (8th Cir. 2010).

Under the sentencing guidelines, if a defendant commits perjury "in respect to a criminal offense," then the court determines a base offense level through a cross-reference to the guideline for an accessory after the fact, USSG § 2X3.1, if the

resulting level is greater than the level under the perjury guideline. *See* USSG § 2J1.3(c). Myles committed perjury in respect to a criminal offense by Sallis, namely, his unlawful possession of a firearm as a felon. Under § 2X3.1, the base offense level is "6 levels lower than the offense level for the underlying offense," where the "underlying offense" is the offense in respect to which Myles committed perjury. The "offense level" for the underlying offense means the "base offense level plus any applicable specific offense characteristics that were known, or reasonably should have been known, by the defendant." USSG § 2X3.1, comment. (n.1).

Analyzing Sallis's felon-in-possession offense as the underlying offense, the district court determined a base offense level of 20, because he committed the firearms offense after a previous felony conviction for a crime of violence. USSG § 2K2.1(a)(4)(A). The court also applied a four-level increase under § 2K2.1(b)(6)(B) for Sallis possessing the gun in connection with another felony offense—his shooting of T.C. Taking the total offense level of 24 and subtracting six levels according to § 2X3.1 resulted in a base offense level of 18 for Myles's perjury. The court applied this base offense level of 18 because it was higher than the level 14 that would have applied under the perjury guideline without the cross-reference. *See* USSG § 2J1.3(c).

Myles argues that because she had no knowledge of Sallis's criminal history, the six-level increase for Sallis's prior crime of violence should not be attributed to her. This court rejected the same argument in *United States v. Davis*, 825 F.3d 359 (8th Cir. 2016), because the plain language of § 2X3.1 does not require a defendant to know the facts that establish the base offense level for the underlying offense. The knowledge requirement of § 2X3.1 is "limited to the 'applicable specific offense characteristics.'" *Id*. at 364 (quoting USSG § 2X3.1, comment. (n.1)). Therefore, the district court here did not err in determining that the base offense level for the underlying offense was 20.

Myles also asserts that the court erred by applying the four-level specific offense characteristic for Sallis possessing the gun in connection with another felony offense. Sallis's commission of another offense was relevant conduct with respect to his unlawful possession of a firearm, and Myles is accountable for that conduct if she knew or should have known about it. *See* USSG §§ 1B1.3, comment. (n.9), 2X3.1, comment. (n.1). Myles argues that she did not know or have reason to know that Sallis, by shooting T.C. in the house, committed the offenses of Willful Injury under Iowa Code § 708.4 and Assault While Displaying a Dangerous Weapon under Iowa Code § 708.2(3). Sallis was never charged with either offense, and Myles was not inside the house when the shooting occurred, so she asserts that she reasonably could have believed at the time of her perjury that the shooting was legally justified.

The record supports the district court's finding that Myles knew or should have known that Sallis committed another offense. Before Sallis fired the gun, T.C. simply entered the house, announced himself by name, and stated that he was there to pick up the children in the house. Myles admitted in testimony that soon after T.C. entered the house to pick up the children located upstairs, Sallis shot him from the top of the staircase. She likewise stated in her plea agreement that as she was leaving her daughter's house, "T.C. entered the residence and Sallis fired multiple shots at T.C." R. Doc. 33.1, at 4. She made no mention before sentencing of any possible justification for the shooting. Given the circumstantial evidence that Sallis's shooting of T.C. was unlawful and unjustified, and Myles's statements about the shooting, the district court did not clearly err in finding that Myles knew or should have known that Sallis committed the offenses of Willful Injury and Assault While Displaying a Dangerous Weapon.

\* \* \*

The judgment of the district court is affirmed.

_____